

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 3 1 2010

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL FUQUA, as Receiver for CRE )
CAPITAL CORPORATION )
                                         )
                                         )   CIVIL ACTION FILE
      Plaintiff,                    )   NO. 1:10 CV-0935
                                           )
v.                                                )
                                           ) **JURY TRIAL DEMANDED**
RICHARD BYWATER and BYWATER )
DEVELOPMENT SERVICES, LLC, )
                                               )
      Defendants.                  )
_____ )

## COMPLAINT

NOW COMES Michael Fuqua, as Receiver for CRE Capital Corporation

("CRE"), and by and through undersigned counsel, files this Complaint against

Defendants Richard Bywater and Bywater Development Services, LLC

(collectively "Defendants" or "Bywater") to recover funds that Defendants

received in a fraudulent transfer from CRE as supposed commission payments for

recruiting investors to the CRE Ponzi scheme, showing the Court as follows:

## BACKGROUND

1.     On January 15, 2009, the Securities and Exchange Commission ("SEC")

        filed suit in the United States District Court for the Northern District of

        Georgia, Securities and Exchange Commission v. CRE Capital Corporation

and James G. Ossie, Civil Action File No. 1:09-CV-0114-RWS (the "SEC Litigation"), seeking injunctive and monetary relief against James G. Ossie ("Ossie") and the appointment of a receiver for CRE.

2. The SEC alleged that from April 2008 through January 2009, Ossie and CRE, a company he controlled, violated the federal securities laws by fraudulently soliciting and inducing investors to participate in a currency trading investment program, by selling unregistered securities to investors and by operating the investment program as a Ponzi scheme. The SEC further alleged that Ossie made numerous false statements regarding the use of the investment funds, the historical rates of return on the investments, and the risk to the investors. Ossie claimed that investors would realize exorbitant profits from trading United States and Japanese currency contracts as the exchange rate fluctuates. The investors signed monthly contracts guaranteeing them a 10% monthly rate of return and paying the Defendants a monthly commission of 5-15% of the amount invested. While Ossie did in fact engage in some currency trading, this trading resulted in a cumulative loss of over $12 million. In fact, CRE was operated as a Ponzi scheme, using the funds of new investors to pay the principal and supposed

"returns" to earlier investors when such "returns" were not actually earned and their principal had been lost or otherwise dissipated.

3. On January 15, 2009, the Court entered a consent order granting a temporary restraining order and asset freeze against Ossie and CRE. In its Order, the Court appointed Michael Fuqua as Receiver of CRE (the "Receiver"). The Order further entered a consent preliminary injunction enjoining Ossie from further violations of the federal securities laws. (A true and correct copy of the January 15, 2009 Order is attached hereto as "Exhibit A.")

4. On June 17, 2009 Ossie filed a Consent to Judgment in the SEC v. Ossie Litigation, pursuant to a settlement that Ossie reached with the SEC. (A true and correct copy of the June 17, 2009 Consent is attached hereto as "Exhibit B.") The judgment enjoins Ossie from future violations of the antifraud provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940, yet leaves it up to the Court to determine the amount of the civil penalty, damages and disgorgement award.

5. On March 17, 2009, Ossie was indicted by a federal grand jury for ten counts of wire fraud. (A true and correct copy of the March 17, 2009 Indictment is attached hereto as "Exhibit C.")

6.      Pursuant to the Indictment, it was alleged that Ossie, "aided and abetted by
        others known and unknown to the Grand Jury, did knowingly and willfully
        devise and intent to devise a scheme and artifice to defraud investors, by
        operating a fraudulent "Ponzi" scheme that raised more than $25 million
        from over 120 investors."

7.      The indictment also alleges that Ossie "employed 'correspondents,' or sales
        persons, who solicited investments based on these representation in
        exchange for commissions."

8.      Ossie pleaded guilty to wire fraud and was sentenced to 82 months in
        federal prison and ordered to pay restitution of $18,761,175. (A true and
        correct copy of Guilty Plea and Plea Agreement is attached hereto as
        "Exhibit D." A true and correct copy of the Judgment against Ossie in the
        Criminal Case is attached hereto as "Exhibit E.").

9.      On September 18, 2009, the Receiver filed a complaint against Alottle
        Group, LLC ("Alottle"), two subsidiaries, Alottle's principals Eric Lapin
        and Kimberly Owenby Lapin (collectively "Alottle Defendants") and other
        sales agents for CRE, asserting claims of fraudulent transfer, unjust
        enrichment and constructive trust, money had and received and attorneys'

fees and expenses based on the defendants' receipt of commissions from CRE for recruiting investors.

10.   On February 25, 2010, this Court approved a settlement between the Receiver and the Alottle Defendants whereby the Alottle Defendants agreed to pay the Receiver $1,071,443.50, and assigned any and all claims they may have against sub-correspondents to the Receiver. (A true and correct copy of the Consent Order Approving Settlement is attached hereto as "Exhibit F.").

11.   As detailed herein, the Bywater Defendants were paid hundreds of thousands of dollars in commissions by Alottle to bring in and retain investors for CRE. Alottle obtained the funds it paid to the Bywater Defendants from CRE.

## JURISDICTION AND VENUE

12.   The Receiver has claims against the Defendants, who improperly received, and have wrongfully retained, funds from CRE or who otherwise are obligated to return funds to CRE.

13.   The Defendants transacted business with and obtained and accepted funds from CRE's Georgia bank accounts, through payments to Alottle who then paid the funds to Defendants.

14. The Receiver is entitled to sue Defendants in the United States District Court for the Northern District of Georgia for multiple reasons: (1) this Court has long-arm jurisdiction over them pursuant to Georgia's long-arm statute, O.C.G.A. § 9-10-91, due to the tortious acts in which they participated and committed in Georgia and (2) the Receiver has the right to sue them under 28 U.S.C. §§ 1962 and 754 in this Court because the Receiver has filed the order appointing him as Receiver in the jurisdictions where the Defendants reside, if other than the Northern District of Georgia. (True and correct copies of these filed orders are attached hereto as "Exhibit G.").

15. This action is ancillary to the receivership. Accordingly, this Court has jurisdiction over the parties and the subject matter of this action. In re Alpha Telcom, Inc., et al., No. CV 01-1283-PA, 2004 US Dist. LEXIS 2002 (D. Or. August 18, 2004); Quilling v. Grand Street Trust, et al., No. 3.04 CV 251, 2005 WL 1983879 (W.D.N.C. August 12, 2005).

16. In addition, this action arises from and is directly related to the SEC Litigation, which provides for nationwide service of process under federal securities laws. 15 U.S.C. §§ 77v(a) and 78aa.

6

17. Jurisdiction and venue are appropriate in this Court as to the Defendants pursuant to 28 U.S.C. §§ 1962 and 754, and the Georgia long-arm statute, O.C.G.A. § 9-10-91.

## THE DEFENDANTS

<u>Bywater Development Services, LLC and Richard Bywater</u>

18. Bywater Development Services, LLC ("Bywater Development") was a Virginia limited liability company, which has been administratively dissolved for failure to pay fees since December 2008.

19. Mr. Richard Bywater was Bywater Development's sole member.

20. Mr. Bywater was Bywater Development's registered agent.

21. Mr. Bywater is an individual currently residing in Cornelius, North Carolina.

22. Through fraudulent transfers, among other things, Defendants have wrongfully received, and have failed to return, money and property that rightfully belong to the Receivership.

23. The Defendants have received and have failed to return money that rightfully belongs to CRE.

24. Sales agents for CRE received commission payments for marketing the CRE investment programs and for referring investors to CRE.  In the CRE

structure, these sales agents were called "Correspondents." Sales agents were also employed by the Correspondents. The sales agents hired by the Correspondents are also called "sub-correspondents."

25.   Alottle was a Correspondent for CRE. Alottle paid the Bywater Defendants as a sub-correspondent for CRE pursuant to a Referral Agreement between Alottle and Bywater Development. (A true and correct copy of the Referral Agreement is attached hereto as "Exhibit H.").

26.   The Referral Agreement provided that Bywater Development would receive a commission from Alottle for each person that Bywater Development recruited to invest in CRE. Other records from Alottle indicate that Bywater's commission was approximately 5% to 7.5% per month of the total amount invested each month. (A true and correct copy of an Alottle document titled "Rich's deals" is attached hereto as "Exhibit I.").

27.   The Defendants recruited investors for CRE by telling potential investors that their principal was 100% guaranteed and that they were also guaranteed interest payments of 10% to 20% per month (called "Return on Investment" or "ROI" in the CRE structure), which amounted to 120% to 240% per year.

28.   In order to invest, the investor entered into a "30 day Currency Trading Contract" or a "30 day Forex Trading Contract" with CRE. The investor had to invest a minimum of $100,000 for 30 days. CRE promised a monthly return of 10% (See Ex. J), 15% (See Ex. K), or 20% (See Ex. L). CRE also guaranteed the return of principle invested. Id.

29.   The Correspondents and sub-correspondents received a commission for each client they recruited and whom invested in CRE, and for each month that the client's investment remained at CRE. These commission payments ranged from 5-16% per month, and thus 60-192% per year.

30.   The Defendants reaped enormous commissions from the funds that they solicited into the scheme.

31.   By simple calculation, Defendants knew or should have known that to pay investors a guaranteed 10-20% per month and commissions to correspondents of 5-16% per month, CRE had to somehow earn more than 15-36% per month and 180-432% per year on its currency trading, which, by its very nature, was a highly risky investment venture.

32.   Defendants ignored the obvious red flags raised by CRE's promise of no risk of loss of principal and guaranteed monthly returns and commissions on

an investment that by its nature could not be guaranteed and would be expected to fluctuate widely.

33. Defendants failed to disclose to the persons that they recruited to invest, the amount of commissions the Correspondents were receiving, and that in most instances, the commissions exceeded the amount of return that was paid on the investment.

34. These Defendants were paid more than 5% per month commission on the investments made (and lost) by others.

35. Defendants should not be permitted to retain the ill-gotten gains paid to them in exchange for recruiting investors to place their funds in this illegal scheme.

36. Commission payments were made from CRE to Alottle, a Correspondent. Alottle then made commission payments to Mr. Bywater or Bywater Development as a sub-correspondent. Thereafter, upon information and belief, Bywater Development made payments to Mr. Bywater and/or Mr. Bywater spent funds from Bywater Development for his own personal use.

37. Defendants have profited from the CRE Ponzi scheme, receiving excessive commissions and have profited from the illegal scheme, and their sales

efforts, to the detriment of their friends, family and colleagues, who have suffered net loss positions.

## STATEMENT OF FACTS

### Offerings and Sales of Securities on Behalf of CRE

38. The investments sold by Ossie, the Correspondents, sub-correspondents and the Defendants were securities under 15 U.S.C. § 77q and § 78j, and the sales were made in violation of federal securities laws. Ossie, the Defendants and others were selling securities that were not registered with the SEC and were not exempt from registration. CRE, Ossie, and those selling the securities were not registered as securities dealers, brokers, or investment advisors with the SEC, any self-regulatory organization, or any state securities regulatory authority, as was required. Moreover, Ossie, the Defendants and others affiliated with CRE were selling these securities through the misrepresentation and misleading omission of material fact in disclosure materials and oral communications with investors and through fraudulent schemes and manipulative devices that deceived investors.

39. Without the active solicitation of investors and subsequent sales of securities by the Defendants, Ossie and other agents of CRE, the Ponzi scheme, which defrauded investors of over $18 million, would and could not have occurred.

40.   Ossie and other agents of CRE, including the Defendants, offered and sold
      at least $27.9 million of securities to more than 140 entities (through which
      individual investors placed their funds), and whom Ossie and the
      Defendants led to believe were putting money into actual, legitimate and
      profitable investments.  CRE and the Defendants represented that CRE
      made a profit by trading United States and Japanese currency as exchange
      rates fluctuated.

41.   CRE would not accept business from individual investors.  Rather, CRE
      required that all investors be a corporation or a limited liability company.

42.   The Defendants were "sub-correspondents," who acted as sales agents or
      referral sources who recruited investors into CRE through Alottle and were
      paid commission payments.

43.   CRE, through Defendants and other agents, offered "30 Day Currency
      Trading Contracts" ("Trading Contracts") at a minimum investment amount
      of $100,000.  (True and correct copies of sample Trading Contracts are
      attached hereto as Exhibits J, K and L)

44.   Investors with less than the minimum investment of $100,000 were allowed
      to pool their investment with other investors to reach the $100,000
      minimum.

45. At the end of the Trading Contract, the investors were promised a return on investment ("ROI") payment and had the option of having their principal returned or entering into a new Trading Contract.

46. CRE and Defendants promised investors a guaranteed ROI of 10% to 20% per month, or 120% to 240% per year, on each of their $100,000 investments. (See Exhibits J through L).

47. CRE paid commissions to its correspondents, including the Defendants, on the Trading Contracts. Commissions were paid when a new client signed a Trading Contract for the first time and upon each ensuing monthly renewal of their Trading Contract.

48. The monthly percentage commission paid by CRE to its correspondents varied, but generally ranged between 5% and 16% of the monthly Trading Contract amount, which amounts to 60% to 192% of the invested funds after twelve months.

49. CRE, through Ossie and the Defendants, told investors that their investment in CRE carried little risk because CRE had established a "reserve" fund which would not be traded or exposed to any risk and would always be available to pay promised interest and redeemed principal should CRE's

13

trading activities become unprofitable. The Reserve Fund was supposed to contain 30% of all funds invested in CRE.

50.   In reality, the investments were not risk-free and CRE did not maintain a reserve account with assets anywhere near sufficient to cover the promised ROI or the invested principal.

51.   CRE and Ossie did use a portion of the invested funds to conduct currency trading through two separate trading accounts. However, CRE and Ossie's trading was not profitable, and in fact, the trading activity resulted in a net loss of approximately $12.2 million.

52.   CRE paid approximately $13.5 million to investors and correspondents out of the $28.2 million collected from investors.

53.   The funds paid out to investors as the return of principal and supposed "ROI" did not come from returns on the investments, as was represented, but instead came from money put into CRE by other investors.

54.   Without the active solicitation of investors and subsequent sales of securities by CRE, through Defendants, the Ponzi scheme, which defrauded investors out of over $28 million, would not have occurred. The extremely high rate of commission paid to the Defendants also contributed to the Ponzi scheme

character of the trading program and very substantially increased the investors' losses.

55. When the Receiver took possession of CRE, CRE's bank and trading accounts contained less than $360,000.

56. Approximately $16 million in investor funds are missing; at least $607,179 of that amount, but possibly more,[1] was transferred from CRE to these Defendants.

**Conduct of the Defendants**

57. The Defendants were sub-correspondents for CRE through Alottle and served as sales agents to solicit unsuspecting persons to invest their funds in the CRE Ponzi scheme.

58. Beginning in May 2008 and continuing through January 2009, the CRE Correspondents and sub-correspondents, including Defendants, offered and sold investment contracts with CRE to investors in various states including, but not limited to, South Carolina, North Carolina, Connecticut, Alabama, Georgia, Maryland, Nevada, Pennsylvania, Virginia, Florida, California,

---

[1] According to Alottle's bank statements, Bywater received $553,929 in total commission payments in 2008 and $53,250 in 2009, totaling $607,179. However, Alottle's 2008 1099 tax form indicates that Bywater was paid $572,929 in 2008 with $561,429 of that amount being commissions. When that amount is added to the 2009 payments, the total is $614,679. (Ex. M).

Tennessee, Washington, Oregon, Delaware, Iowa, New Jersey, Colorado, Idaho, Missouri, Indiana and the District of Columbia.

59. CRE, the Correspondents and the sub-correspondents, including the Defendants, provided materially false information concerning CRE and the proposed investments, including stating that the investments were safe and risk-free. In fact, the investments were a sham and the representations were false.

60. CRE, the Correspondents and the sub-correspondents, including the Defendants, represented to investors that their investment would generate a 10% to 20% return per month through CRE's trading of United States and Japanese currency. In fact, CRE lost over $12 million in its currency trading activities, was never profitable and the only way that CRE was able to pay ROI or commissions was by using the new investments of other investors.

61. In essence, CRE was robbing the new investors to pay CRE, the Correspondents, the sub-correspondents, including the Defendants, and the older investors. In order to keep the scheme running, CRE needed a constant flow of new investments.

62. CRE, the Correspondents and the sub-correspondents, including the Defendants, told investors that their invested money was guaranteed because

CRE maintained a "reserve" account with a balance sufficient to cover (1) a full return of principal to all investors, and (2) guaranteed ROI.

63. In fact, CRE maintained almost no funds in any supposed reserve account and at all times was wholly insufficient to cover the principal amount invested or the "guaranteed" ROI.

64. The supposed investments in CRE sold by the Correspondents and the sub-correspondents, including the Defendants, offered no protection of investor funds. The excessive unsuitable guaranteed ROI payments and the Defendants' excessive commissions were destined to cause loss. The CRE investment was highly unsuitable to every single person the Defendants solicited.

65. The Correspondents and the sub-correspondents, including the Defendants, were paid a certain agreed-upon percentage of each Trading Contract they brought in to CRE and a certain agreed-upon percentage for each month that the Trading Contracts were renewed. The percentages paid changed over time.

66. The money used to pay the commissions to these Defendants constitutes ill-gotten gains from the fraudulent sales of unregistered securities to unsuspecting investors. The Defendants have no legitimate claim to receive

or retain the commissions because the commissions were paid to them specifically for their role in causing these illegal sales of the unregistered securities, as described herein, to occur.

67. The money used to pay the commissions to the Defendants also constitutes a fraudulent transfer under O.C.G.A. § 18-2-70 et. seq. The Defendants' participation in and their role in causing these illegal transactions to occur did not constitute valuable consideration, but instead was wrongful and caused CRE loss and caused and/or contributed to CRE's insolvency.

68. CRE made these commission payments to Alottle, and Alottle in turn made the payments to the Defendants, while CRE was insolvent and without ensuring that CRE received services or other consideration of reasonably equivalent value.

69. Upon information and belief, Mr. Bywater spent the funds in Bywater Development's accounts for his own personal use.

70. Neither Bywater Development nor Mr. Bywater provided any reasonably equivalent value in exchange for the exorbitant commission payments that they received.

71. The payments to the Defendants were, accordingly, fraudulent transfers of CRE's assets.

72.   The Defendants are not entitled to retain these funds and are obligated to repay them to CRE so they can be repaid to investors.

### Bywater Development and Richard Bywater

73.   Bywater Development's actions were completely controlled by Richard Bywater.

74.   Mr. Bywater and/or Bywater Development referred approximately 28 investors to CRE, many of whom could not afford to lose funds in risky investments, including a family who was investing funds donated to fight their daughter's cancer.

75.   Mr. Bywater and/or Bywater Development brought into CRE approximately $3,200,000 from approximately 28 investors.

76.   From May 2008 to January 2009, Bywater was paid commissions of at least $607,179, and possibly more, for referring these investors to CRE.

77.   Bywater received the following amounts from CRE (through Alottle) on or about the following dates:

| Paydate | Comm. Paid |
|---------|-----------|
| 8/12/2008 | $3,750 |
| 8/15/2008 | $7,500 |
| 8/15/2008 | $5,250 |
| 9/3/2008 | $7,500 |
| 9/3/2008 | $3,750 |
| 9/3/2008 | $3,750 |
| 9/3/2008 | $3,750 |

| | |
|---------|-----------|
| 9/5/2008 | $3,750 |
| 9/11/2008 | $7,500 |
| 9/11/2008 | $3,750 |
| 9/11/2008 | $3,750 |
| 9/11/2008 | $3,750 |
| 9/11/2008 | $3,750 |
| 9/17/2008 | $3,750 |
| 10/1/2008 | $3,750 |

| | |
|---------|-----------|
| 10/1/2008 | $1,500 |
| 10/1/2008 | $3,750 |
| 10/8/2008 | $3,750 |
| 10/8/2008 | $3,750 |
| 10/10/2008 | $3,750 |
| 10/10/2008 | $3,750 |
| 10/10/2008 | $3,750 |
| | $3,750 |

20

| Date | Amount |
|---|---|
| 10/15/2008 | $2,650 |
| 10/15/2008 | $3,750 |
| 10/16/2008 | $3,750 |
| 10/17/2008 | $3,750 |
| 10/22/2008 | $3,750 |
| 10/22/2008 | $3,751 |
|  | $3,750 |
| 10/23/2008 | $3,749 |
| 10/24/2008 | $1,500 |
| 10/31/2008 | $5,250 |
| 11/7/2008 | $3,750 |
| 11/7/2008 | $11,251 |
| 11/7/2008 | $7,501 |
| 11/7/2008 | $11,250 |
| 11/7/2008 | $3,752 |
| 11/7/2008 | $3,751 |
| 11/7/2008 | $3,750 |
| 11/7/2008 | $3,749 |
| 11/7/2008 | $7,500 |
| 11/7/2008 | $7,499 |
| 11/7/2008 | $11,250 |
| 11/7/2008 | $3,748 |
| 11/14/2008 | $1,500 |
| 11/14/2008 | $9,000 |
| 11/14/2008 | $7,501 |
| 11/14/2008 | $7,500 |
| 11/14/2008 | $3,750 |
| 11/14/2008 | $11,251 |
| 11/21/2008 | $11,250 |
| 11/21/2008 | $7,500 |
| 11/21/2008 | $3,750 |

| Date | Amount |
|---|---|
| 12/5/2008 | $24,000 |
| 12/5/2008 | $15,000 |
| 12/5/2008 | $12,750 |
| 12/5/2008 | $11,251 |
| 12/5/2008 | $11,250 |
| 12/5/2008 | $7,500 |
| 12/5/2008 | $18,750 |
| 12/5/2008 | $11,250 |
| 12/5/2008 | $16,500 |
| 12/5/2008 | $15,000 |
| 12/5/2008 | $13,500 |
| 12/5/2008 | $11,250 |
| 12/5/2008 | $7,500 |
| 12/5/2008 | $15,000 |
| 12/5/2008 | $13,125 |
| 12/12/2008 | $7,125 |
| 12/12/2008 | $6,625 |
| 12/12/2008 | $1,250 |
| 12/12/2008 | $18,750 |
| 12/12/2008 | $18,375 |
| 12/12/2008 | $11,250 |
| 12/19/2008 | $4,500 |
| 12/19/2008 | $9,375 |
| 1/2/2009 | $18,750 |
| 1/2/2009 | $15,750 |
| 1/2/2009 | $11,250 |
| 1/2/2009 | $7,500 |
| TOTAL | $607,179 |

78. Bywater owes the Receiver at least $607,179, and possibly more.

79. The Receiver made demand to Mr. Bywater and Bywater Development for the return of these funds. (A true and correct copy of the Receiver's demand letter to Bywater is attached hereto as "Exhibit N.") Mr. Bywater and Bywater Development have failed to return any of the money they received.

## CAUSES OF ACTION

## COUNT I – FRAUDULENT TRANSFER (O.C.G.A. § 18-2-70 et seq.)

80. The Receiver incorporates and re-alleges paragraphs 1 through 79 as if set forth fully herein.

81. Despite promises to keep investor funds in CRE accounts to use in trading United States and Japanese currency, Ossie and other representatives of CRE directed the transfer of nearly all of the funds out of CRE's bank accounts unrelated to supposed investments.

The Transfers to Defendants Constitute "Fraudulent Transfers" under Georgia Law

82. As a result of these transfers, CRE was left with assets unreasonably small in amount and value in relation to the business in which it was engaged and the obligations it owed and contributed to its insolvency.

83. CRE was operated as a Ponzi scheme, as a direct and intended result of which caused CRE to incur debts to investors and other obligations far beyond CRE's ability to repay such obligations.

84. As a Ponzi scheme, CRE was insolvent from inception and was insolvent at the time of the transfers to Defendants.

85. Salespersons who extend the fraud of a Ponzi scheme by recruiting new investors do not provide the Ponzi scheme with reasonably equivalent value in exchange for the commissions paid to the salesperson.

86. CRE was operating as a Ponzi scheme and as such, as a matter of law, did not receive consideration of any value, much less reasonably equivalent value, in exchange for the transfers to Defendants.

87. Defendants did not provide services to CRE or Alottle which would entitle them to receive fees, compensation or commissions from CRE or Alottle.

88. Defendants received at least $607,179 from CRE, through Alottle, as commission payments for recruiting investors.

89. The Receiver made a demand for the return of funds from the Defendants, but they have failed and refused to repay the amounts owed to the Receivership.

90.  Defendants are liable to the Receivership for the funds that they received from CRE, plus interest at the legal rate since the time of receipt.

## COUNT II UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST

91.  The Receiver incorporates and re-alleges paragraphs 1 through 90 as if set forth fully herein.

92.  As set out above, these defendants received over $607,000 to from CRE, through Alottle.

93.  Upon information and belief, Mr. Bywater caused Bywater Development to distribute some or all of the commission payments received from CRE to himself.

94.  CRE unlawfully obtained the investments from investors. Accordingly, the commissions paid to and received by the Defendants are the proceeds of CRE's illegal activities and are impressed with constructive trust.

95.  The Defendants received the funds as commissions for referring investors to CRE.

96.  The Defendants did not convey any item of value or perform any services for the legitimate benefit of CRE in exchange for the transfers from CRE.

97.  The Defendants accepted, retained, and wrongfully benefited from the transfers from CRE.

98.  It would be inequitable for the Defendants to retain the funds they received from CRE.

99.  The Defendants have been unjustly enriched.

100.  The Receiver is entitled to recover the amounts transferred to the Defendants.

101.  The Receiver is entitled to recover prejudgment interest from the Defendants from the date of the receipt of such funds.

## COUNT III – MONEY HAD AND RECEIVED

102.  The Receiver incorporates and re-alleges paragraphs 1 through 101 as if set forth fully herein.

103.  As set forth above, Defendants received over $607,000 from CRE, through Alottle.

104.  Upon information and belief, Bywater Development then transferred the funds to Mr. Bywater.

105.  Upon information and belief, Mr. Bywater caused the Bywater Development to distribute the money received from CRE through Alottle to himself or spent funds in Bywater Development's bank accounts for his own use.

106.  The amounts paid to the Defendants are proceeds that were unlawfully obtained from investors by means of artifice and fraud.  Accordingly, the

commissions received by the Defendants are impressed with constructive trust.

107. The Defendants received the funds as commissions for referring investors to CRE.

108. The Defendants have retained the funds they received from CRE through Alottle for their own use and have supplied no benefit to CRE.

109. CRE has been insolvent since its inception.

110. CRE is the rightful owner of these funds and, in turn, owes payments to its investors.

111. The Defendants have refused to return the funds in their possession that belong to CRE despite the Receiver's demand for return of the funds.

112. As a direct and proximate cause of the Individual Defendants' failure to return the funds in their possession that belong to CRE, CRE has been damaged.

113. The Defendants are liable to CRE for the amounts that each received.

## COUNT IV – ATTORNEYS' FEES AND EXPENSES PURSUANT TO O.C.G.A. § 13-6-11

114. The Receiver incorporates and re-alleges paragraphs 1 through 108 as if set forth fully herein.

115. These Defendants have acted in bad faith, been stubbornly litigious, and caused the Receiver unnecessary trouble and expense.

116. Accordingly, the Receiver, on behalf of CRE, is entitled to recover his attorneys' fees and expenses incurred in this action.

WHEREFORE, the Receiver respectfully prays that:

    (a)    This case be tried before a jury.

    (b)    The Court award to the Receiver, on behalf of the Receivership, damages in an amount to be determined at trial plus interest at the maximum legal rate accruing from July 27, 2009 or the earliest day allowed by law.

    (c)    That the Court impose all costs of this action, including reasonable attorneys' fees, on the Defendants set forth in Count IV, and on behalf of CRE;

    (d)    That the Court award the Receiver prejudgment interest on all damages at the highest rate allowed by law against the Defendants set forth above; and

    (e)    That the Court award to the Receiver, on behalf of CRE, such other and further relief as the Court deems just and proper.

Respectfully submitted this 31st day of March 2010.

Thomas S. Richey
Georgia Bar No. 604525
Tom.Richey@bryancave.com
Jennifer D. Odom
Georgia Bar No. 549717
Jennifer.Odom@bryancave.com
Ann W. Ferebee
Georgia Bar No. 431941
Ann.Ferebee@bryancave.com

BRYAN CAVE POWELL GOLDSTEIN
One Atlantic Center – Fourteenth Floor
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 572-6600

Attorneys for Michael Fuqua,
Receiver for CRE Capital
Corporation

27